Filed 5/9/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re the Marriage of LESLIE and TERRY MOORE. | C065210 |
| LESLIE MOORE, | (Super. Ct. No. FL034462) |
| Appellant, | |
| v. | |
| TERRY MOORE, | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of Butte County, William P. Lamb, Judge. (Retired judge of the Mendocino Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Reversed in part and affirmed in part.

Leslie Moore, in pro. per.; Law Office of Elizabeth N. Niemi and Elizabeth N. Niemi for Appellant.

Kimberly Merrifield for Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, IIC, IIE, III, IV, V and VI.

1

This appeal arises from judgments in a marriage dissolution action regarding the division of retirement and employment benefits, the division of other assets, the award of temporary and permanent spousal support, and the denial of requests for attorney fees and costs. We affirm in part and reverse in part.

FACTS

Appellant Leslie Moore and respondent Terry Moore were married for over 27 years. They married on October 17, 1980. Leslie is a homemaker. Terry is an officer with the Chico Police Department, and has been since 1984. Leslie filed a petition for dissolution on March 18, 2008.

The case proceeded with difficulty. All of the Butte County Superior Court judges eventually recused themselves for cause. In August 2009, the presiding judge reassigned the case to a visiting judge, the Hon. William P. Lamb, for trial.

Leslie was represented by three different attorneys. The latter two received permission from the court to withdraw as counsel. Leslie proceeded to represent herself at trial. She filed her appellant's opening brief in pro. per., but she retained an attorney to file her reply brief.

The court awarded temporary spousal support. As discussed further below, Leslie later requested the court to modify the award, but the court never entertained the requests.

The court entered judgment terminating the marriage on September 1, 2009, effective August 19, 2009. Trial continued on the issues of support, division of Terry's retirement and employment benefits, property division, and attorney fees. The court entered its judgment on those matters on June 3, 2010. It ordered Terry to pay spousal support of $900 per month. It awarded the couple's home to Leslie by stipulation of the parties, a value of $230,000. It also awarded Leslie one-half of the community interest in Terry's retirement (PERS), deferred compensation, and other deposits. It reserved jurisdiction on two of Terry's employment benefits: a retiree medical reimbursement account and his accrued sick leave. It did not rule on a motion by Leslie for sanctions

2

due to Terry's failure to disclose the reimbursement account and other employment benefits. It also concluded Terry's accrued vacation had no value.

The court ordered Leslie to make an equalization payment of $153,648. That payment included reimbursement for Terry's separate property contributions to the community and the value of Leslie's exclusive occupation of the couple's home from separation to judgment. Finally, the court ordered the parties to bear their own attorney fees and costs.

Leslie appeals, challenging numerous trial court rulings. She contends the court erred by: (1) refusing to hear her motion to modify temporary spousal support retroactively; (2) incorrectly dividing, or reserving jurisdiction on, Terry's retirement benefits, employment benefits, and deferred compensation, and not ruling on her motion for sanctions for failure to disclose; (3) incorrectly dividing and valuing other community assets, including Leslie's use of the home after separation and Terry's separate property contribution; (4) awarding too little in permanent spousal support; and (5) not awarding her attorney fees and costs. She also contends (6) the entire trial proceeding was tainted with bias.

We will address each contention, and we will provide additional facts as required.

DISCUSSION

I

*Request to Modify Temporary Spousal Support Retroactively*

Leslie contends the trial court erred when it refused to hear her request to modify the award of temporary spousal support retroactively. She claims the award erroneously imputed income to her based on her ability to work when in fact she is permanently disabled. She claims the court reserved jurisdiction to address this issue after entering its order for temporary spousal support, and it erred when it refused to hear her motion and other requests to modify the award. We agree.

3

A.    *Additional background information*

Leslie moved for guideline temporary spousal support and attorney fees on August 25, 2008.  She also asked that her dissolution case be consolidated with an earlier request she had filed for a domestic violence restraining order.  She declared she had no income and had monthly expenses of nearly $5,000.

In his response, Terry consented to guideline spousal support less $1,200 for Leslie's use of the residence rent free and without a mortgage.  He also requested each party bear their own attorney fees.  Terry claimed Leslie had the ability to earn the minimum wage but she had deliberately chosen not to work.  He asked that the minimum wage be imputed to her and she be given a *Gavron* warning.[1]  He declared his average monthly income, before taxes, was $6,846, and he had monthly expenses of $3,274.

On November 18, 2008, pursuant to a stipulation by the parties, the trial court ordered Terry to pay Leslie temporary spousal support in the amount of $1,857 per month, effective September 6, 2008.  In reaching its decision, the court imputed $690 in monthly income to Leslie, an amount equivalent to 20 hours of work per week at minimum wage.  The court stated its order, "and the factors upon which it is based, are without prejudice to either party and *are subject to retroactive modification* to a date to be determined by the Court," but no earlier than March 1, 2008.  (Italics added.)

At a hearing on August 19, 2009, Leslie's counsel stated the parties intended on that day for the court to address, among other matters, an issue that had been reserved: whether Leslie should be imputed any earnings value for purposes of spousal support.  If she should not, counsel would present information on whether there should be a

---

[1]    *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705; see also Family Code section 4330, subdivision (b), which authorizes the trial court to advise the recipient of spousal support that she should make reasonable efforts to assist in providing for her support needs.

retroactive modification of the spousal support order. However, the court did not reach the issue that day because Leslie became frustrated about not being able to speak on an issue, and she left the courtroom. Her attorney thereafter withdrew, and Leslie represented herself through trial.

At a hearing on December 15, 2009, on a motion for discovery by Leslie, the court attempted to have the parties define the pending issues in order to set the scope of any discovery. During that discussion, counsel for Terry stated the issue of Leslie's employability had been rendered moot because Leslie had been determined to be permanently disabled and eligible for SSI benefits. Terry would no longer argue that Leslie should be seeking gainful employment for purposes of determining spousal support.

On December 21, 2009, Leslie filed a declaration with the court which she intended to be used as a statement for trial readiness and issues to be addressed at trial. She asserted Terry was in arrears in paying temporary spousal support, and she also claimed the amount of temporary support was in error in part because the court had imputed monthly income to her.

On January 6, 2010, she moved to adjust temporary spousal support retroactively and to calculate arrears. When the trial court took up the motion at trial, it refused to hear it. It stated the purpose of trial was to set permanent spousal support which would replace temporary spousal support. It held: "The temporary spousal support is not before the court. I'm here to hear evidence on permanent support." The court ordered that any remaining issues regarding temporary spousal support were to be addressed separately in a posttrial motion.

Leslie continued to raise the issue during trial. She did so in a final statement to the record, in her written closing argument, and in her intended oral closing argument which she filed with the court. She also raised it on the final day of trial. At that time, the court stated spousal support arrears were not before it and no motion for spousal

support arrears had been made. It said the issue still existed after trial, as jurisdiction had been retained, but there was no motion at that time.

The court understood Leslie's contention to be she was entitled to a higher amount of temporary support and that additional amount had not been paid. Terry's counsel said that issue had been waived. Leslie asserted she had raised it in her brief and statement of issues, but she had not been allowed to present her case at trial.

Leslie attempted to raise the issue again by a posttrial motion. The court did not file the motion but entertained argument on whether an order to show cause should issue to schedule a hearing on her motion. The court stated the issue of nonpayment of temporary spousal support had been addressed at trial. As to whether the temporary support could be retroactively adjusted to have started in March 2008, the court recognized the temporary support award had provided for retroactivity, and it remembered Leslie arguing this point in trial. Terry's counsel argued the issue was waived because Leslie did not file a motion before or during trial to address it. Over Leslie's protest that she had in fact brought such a motion, the court ruled the posttrial motion was premature, as it was filed before judgment was entered. Leslie filed her notice of appeal the same day the trial court filed its judgment on reserved issues.

B.    *Analysis*

Terry claims Leslie waived appellate review of the issue of temporary spousal support because she "did not file a timely appeal of the spousal support award of $1857 . . . that . . . was made in 2008." In making this claim, however, Terry misapprehends the thrust of Leslie's argument. He also fails to properly account for the fact that the parties *stipulated* to the terms of the temporary spousal support order, including its retroactive modifiability.

As we understand it, Leslie is not arguing that it was error for the trial court to order Terry to pay her only $1,857 in temporary spousal support in November 2008, when the court made that order. In fact, Leslie could not legitimately make that argument

6

here -- not only because any challenge to the 2008 order would be too late now, but also because the parties stipulated to the terms of that order, and a party cannot challenge on appeal an order to which she consented. (*Atchison, T. & S. F. Ry. Co. v. Hildebrand* (1965) 238 Cal.App.2d 859, 861.) In our view, rather than raising a challenge to the 2008 support order that would be too late and would not be one she could make in any event, Leslie is challenging the trial court's refusal to consider her various requests that the court retroactively modify the temporary spousal support order, which the parties agreed the court could do.

Terry offers no response to Leslie's argument viewed in that light. Thus, Terry offers no defense of the trial court's refusal to consider whether Leslie should have been provided with temporary support all the way back to March 1, 2008 (or to some later date before Sept. 6, 2008) and whether the amount of the temporary support order should have been greater because -- for instance -- Leslie did not in fact have the ability to work half-time for the minimum wage.

The parties agreed the court could retroactively modify the temporary support order, the court included that agreed-upon retroactivity provision in the order, and no one challenged that order on appeal (and rightly so, since they agreed to it). Accordingly, that order, "including the retroactivity condition, is res judicata." (*In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 600.) Under these circumstances, it was error for the court to refuse to consider Leslie's various requests for retroactive modification of temporary spousal support.

Terry asserts there is no evidence in the record showing the temporary award was improper. We disagree with this point as well. The motion for retroactive modification of the award was well founded. After the temporary order had been made and trial begun, Terry's counsel admitted Leslie was unemployable, and he would not seek attribution of income in the determination of spousal support. This admission eliminated a factor upon which the temporary order rested, and the court should have exercised its

7

reserved jurisdiction to reconsider its order upon Leslie's motion. The court erred in not doing so, and the judgment must be reversed to allow the court to hear and rule upon her motion.

## II

### *Division of Employment Benefits and Retirement*

Leslie contends the trial court erred in dividing certain of Terry's employment benefits and retirement. She challenges the court's ruling on Terry's retiree medical reimbursement account, his accrued vacation, the commencement of her share of Terry's PERS retirement, his accrued sick leave, and his deferred compensation. She also claims the court erred by not imposing sanctions against Terry for his failure to disclose the medical reimbursement account and other employment benefits. We conclude the court erred in its analysis of Terry's accrued vacation. We also conclude the court erred when it declined to consider sanctions against Terry for failing to disclose the medical reimbursement account. We affirm the court's ruling on the other employee benefit and retirement issues.

A.    *Medical reimbursement account*

One of the fringe benefits of Terry's employment is participation in a retiree medical reimbursement plan known as the retiree medical expense and health insurance trust (medical trust). The trial court reserved jurisdiction to award any interest in the medical trust, as it found the medical trust's current value was unknown and speculative. The court ordered its value, if any, to be determined upon Terry's retirement.

Leslie claims the trial court erred in reserving jurisdiction on the medical trust. She contends the medical trust is a community asset that could have been divided at trial based on an actuarial valuation of present value, and the trial court erred when it did not order the valuation to be performed at Terry's expense. She also claims Terry should be subject to sanctions, as he did not disclose this asset in his required disclosures. We conclude the medical trust is a community asset, but the court did not abuse its discretion

8

in reserving jurisdiction on this issue. However, we conclude the court must consider Leslie's request for sanctions.

1.        *Additional background information*

In its memorandum of understanding (MOU) with the Chico Police Officers' Association (CPOA), the City of Chico (the City) acceded to the CPOA establishing the medical trust. The medical trust "is to provide funding for medical expenses and health insurance . . . for eligible retirees, or qualified family members of eligible retirees as established by the Trust." The City agreed to fund the trust with monthly contributions per police employee on active duty. The medical trust is administered and managed by the CPOA. As president of the CPOA, Terry designed the entire trust.

The medical trust is a unique asset designed to pay retirees a monthly benefit up to a certain maximum for covered medical expenses and health insurance premiums. To an extent, the medical trust is a defined contribution plan. The City pays a set amount each month into the trust for each public safety employee. That amount was $200 per month until January 1, 2009, when it was raised to $250 per month, and until January 1, 2010, when it was raised to $300 per month. The City began contributing to Terry's account in 2004, and as of April 2009, Terry had earned $7,324.24 in the medical trust.

However, the employee's right to the funds does not mature until retirement, and even then he may not access the entire amount. The retiree must submit a claim for reimbursement. The medical trust will reimburse a valid claim up to a monthly maximum amount. The retiree's maximum monthly benefit is set by the medical trust's trustees, and is calculated for each retiree based on the number of years of full-time employment since January 1, 2001, and the number of years the City made contributions for that retiree. If the retiree claims no expenses in a month, he receives no monthly benefit. Leslie argued this was not likely to happen, as the trust was set up to pay medical insurance premiums. Terry acknowledged it would pay those premiums.

9

As of the date of separation, Terry had not vested in the medical trust, as under the trust's terms at that time, the City had not contributed long enough to Terry's account to allow him to vest. Since then, however, Terry has vested. Because Terry has worked a sufficient number of years and received a prescribed minimum number of contributions from the City, the monthly benefit will be available to him from when he retires until his death. Any surviving spouse and dependents will have limited benefits after that time. As of the time of trial, the medical trust had yet to make any payments or determine a monthly benefit amount as no beneficiary's rights, including Terry's, had matured.

Terry did not disclose the medical trust in any of his required declarations of disclosure. Leslie filed a motion for sanctions for Terry's failure to disclose "the two largest assets in the estate." She referenced her earlier declarations, in which she declared Terry had failed to disclose two of the largest assets, one of which was the medical trust. The other "asset" appears to have been Terry's other employment benefits and, in particular, his accrued vacation and sick leave. The trial court never addressed the motion.

2. *Analysis*

The medical trust is a community asset. Similar to a nonvested pension and other contingent retirement benefits, the medical trust's benefits are property rights because they represent a form of deferred compensation for services rendered. In this case, they are a contractual right derived from Terry's employment agreement with the City and earned by him while married to Leslie. They are thus a divisible community property asset.

"Generally, all property acquired by a spouse during marriage before separation is community property. (See Fam. Code, §§ 760, 771.) [¶] Under the leading case of *In re Marriage of Brown* (1976) 15 Cal.3d 838 ([*Brown*]), and its progeny, such property may include the right to retirement benefits accrued by the employee spouse as deferred compensation for services rendered. (*Id.* at pp. 841-842.) This is the case whether or not

10

the right to retirement benefits is 'vested' in the sense of 'surviv[ing] . . . discharge or voluntary termination,' and whether or not it is 'matured' in the sense of amounting to an 'unconditional' entitlement 'to immediate payment.' (*Id.* at p. 842.) What is determinative is not any 'abstract terminology' of this sort (*id.* at p. 851), but rather a single concrete fact -- time. The right to retirement benefits 'represent[s] a property interest; to the extent that such [a] right[] derive[s] from employment' during marriage before separation, it 'comprise[s] a community asset . . . .' (*Id.* at p. 842.)" (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 177 (*Lehman*).)

The community has an interest in the medical trust to the extent the monthly payments were made on Terry's behalf while he was married to Leslie. In this case, that would be all payments made into the trust by the City from the trust's conception until Terry and Leslie separated on March 1, 2008.

However, the trial court did not abuse its discretion by reserving jurisdiction to divide and value the community property interest at a later date. "Upon dissolution of a marriage, the trial court has broad discretion in the division of the community property interest in a spouse's pension rights and can exercise its discretion in either of two ways. The trial court may either determine the present value of community property rights and award them to one spouse with offsetting community or other assets to the other (commonly called the cash out method), or it may divide the community interest in kind between the spouses, reserving jurisdiction to supervise future payments to each spouse. ([*Brown*], *supra*, 15 Cal.3d at p. 848.)" (*In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 749 (*Bergman*).)

"Because it is not possible to develop comprehensive guidelines for trial courts to follow in deciding whether to cash out or divide in kind community interests in pensions [or other deferred compensation], and because this decision is reached primarily by the weighing of equitable and factual considerations, appellate courts should not second

11

guess the exercise of the broad discretion of trial courts in the absence of a clear showing of an abuse of that discretion. [Citations.]" (*Bergman, supra*, 168 Cal.App.3d at p. 751.)

There is no clear showing the trial court abused its discretion in reserving jurisdiction. The community's interest in the medical trust is difficult to value as of the date of separation and even as of today. At separation, Terry was not vested in the benefit. By trial, Terry had vested, but contingencies exist that could greatly affect the benefit's value. The benefit does not mature until Terry retires, and the amount of the benefit depends on the number of years Terry works for the City and the number of years the City contributes to the trust. Even after the benefit matures, the benefit is contingent on Terry filing claims for reimbursement of his covered medical expenses or insurance premiums. Because Terry is still working and cannot be forced to retire, because he continues to earn this benefit since the parties separated, and because the benefit when matured is still contingent, the community estate's interest cannot easily be valued at the present time.

In addition, relying on a present actuarial value could result in a substantially unequal division. Terry could die before the benefit matures, or he could retire before his right matures at the highest benefit level available. In either of those circumstances, Leslie would have received an unequal share of the asset if it was paid out now on its present cash value. Moreover, neither party submitted actuarial evidence of present value, and the trial court was not obligated to order Terry to fund that cost. Because of these uncertainties, the court did not abuse its discretion by reserving jurisdiction on the division and valuation of the medical trust.

Leslie claims the court erred by reserving jurisdiction indefinitely. (See *Bergman, supra,* 168 Cal.App.3d at p. 755.) But Family Code section 2550 "expressly empowers the trial court to reserve jurisdiction to make a property division at a later time." (*In re Marriage of Kilbourne* (1991) 232 Cal.App.3d 1518, 1525 [re predecessor statue].) Moreover, under the circumstances of this case, the court's reservation of jurisdiction was

not truly indefinite. Retirement was not too far distant. Terry was eligible to begin earning retirement under PERS at age 50. At the time of trial, Terry was 57 years old, had been employed with the City since 1984, and he planned to work at least a total of 30 years, or until 2014.

In any event, this asset seems the type of asset best left to the trial court's reserved jurisdiction. By reserving jurisdiction in order to perform an in-kind division upon Terry's retirement, the trial court equally divided the risk that the benefit will fail to mature, and it deferred the asset's valuation until the major contingency, Terry's retirement, is resolved. Whether to divide a contingent community asset by cash-out valuation or by in-kind partition upon reserved jurisdiction lies within the trial court's sound discretion (*Brown, supra*, 15 Cal.3d at p. 848), and the court did not abuse that discretion by reserving jurisdiction on the medical trust.

We do, however, conclude the court erred when it failed to consider Leslie's request for sanctions against Terry for his failure to disclose the medical trust in either of his preliminary or final declarations of disclosure. After Terry conceded he had not disclosed the medical trust, and Leslie protested the lack of disclosure, the trial court stated Terry was not obligated to disclose it if it was his position the asset had no value. This was incorrect.

A party's preliminary declaration of disclosure must identify all assets in which the declarant may have an interest, regardless of the characterization of the asset as community or separate property. (Fam. Code, § 2104, subd. (c)(1).) For purposes of this requirement, the term "[a]sset" includes "any real or personal property of any nature, whether tangible or intangible, and whether currently existing or contingent." (Fam. Code, § 2101, subd. (a).) This is so whatever the declarant's opinion of value. The medical trust qualified as an asset Terry was required to disclose.

If a party fails to comply with the disclosure requirements, the trial court "shall . . . impose money sanctions against the noncomplying party. Sanctions shall be in an

13

amount sufficient to deter repletion of the conduct or comparable conduct, and shall include reasonable attorney's fees, costs incurred, or both, unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust." (Fam. Code, § 2107, subd. (c).)

On remand, the trial court is directed to hear and rule on Leslie's motion for sanctions for Terry's failure to disclose the medical trust.[2]

B.    *Vacation pay*

The trial court ruled Terry's accrued vacation pay was not a community property asset because it could not be valued and divided. Terry had accrued vacation time of 480 hours, the maximum he could earn. If cashed in, it would be worth some $17,000, but it can be cashed in only at the time of retirement. The court also noted that by the time Terry retires, all of the maximum 480 hours will have accrued after separation and become his separate property. The court thus ruled the asset had no present value.

Leslie contends the trial court erred in not dividing the vacation pay. She claims vacation pay is a form of community property wages that should be divided as part of a dissolution proceeding. We review the trial court's determination as to characterization independently (*Lehman, supra*, 18 Cal.4th at p. 184), and we agree with Leslie's claim.

"It is established that vacation pay is not a gratuity or a gift, but is, in effect, additional wages for services performed. [Citations.]" (*Suastez* v. *Plastic Dress-Up Co*. (1982) 31 Cal.3d 774, 779.) "The right to a paid vacation, when offered in an employer's policy or contract of employment, constitutes deferred wages for services rendered." (*Id*. at p. 784.) Once vested, paid vacation time cannot be forfeited. (Lab. Code, § 227.3.)

---

[2]    The trial court is not required to consider sanctions for nondisclosure of any other employment benefits, as Terry disclosed them. He disclosed his PERS and deferred compensation benefits in the form declaration, and he disclosed his accrued vacation and sick leave by attaching his pay statement.

14

"Consequently, like any other form of deferred compensation, accrued vacation benefits are a property interest which, to the extent earned during marriage and before separation, are divisible community property at marriage dissolution. [Citation.]" (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2013) ¶ 8:96, p. 8-27.)

Terry originally contended that accrued vacation is not a community asset under the rule of *In re Marriage of Lorenz* (1983) 146 Cal.App.3d 464, 467-468 (*Lorenz*). In that case, the Second Appellate District held accrued vacation pay was not a community asset because it could not be exchanged for cash upon the date of separation. However, the court did not discuss Labor Code section 227.3, which provides an employee must be paid for vested vacation time upon termination of employment. As a result, the *Lorenz* court did not consider whether vacation pay could be valued currently based on the fact the employee spouse could receive cash for it on termination. Thus, *Lorenz* does not apply here.

Because the evidence showed that Terry was eligible to retire at the time of trial but had chosen not to, and because Terry can cash in his accrued vacation pay when he retires, the only thing preventing Terry's accrued vacation pay from having immediate cash value to him at the time of trial was his decision to continue working. These facts bring the case within the rationale of the Supreme Court's decision in *In re Marriage of Gillmore* (1981) 29 Cal.3d 418 (*Gillmore*). In *Gillmore*, the husband was eligible to retire but wanted to keep working. The wife sought an order requiring him to pay her share of the retirement benefits he could be drawing, but the trial court refused. The Supreme Court reversed, stating as follows: "Under the cases and statutory law, [husband] cannot time his retirement to deprive [wife] of an equal share of the community's interest in his pension. It is a 'settled principle that one spouse cannot, by invoking a condition wholly within his control, defeat the community interest of the other spouse.' [Citations.]" (*Id*. at pp. 422, 423.)

15

The *Gillmore* court explained, "Compensation is possible here because the value of [wife's] interest is known to the court. Also, the only condition to the payment of the benefits, [husband's] retirement, is entirely within his control. . . . [¶] [Husband's] claim that he is being forced to retire misses the point. He is free to continue working. However, if he does so, he must reimburse [wife] for the share of the community property that she loses as a result of that decision. His claim that the court lacks jurisdiction to order him to make payments to [wife] because it lacks jurisdiction over his separate property also lacks merit. [Husband] alone will make the decision to use separate property to reimburse [wife], when and if he decides not to retire. His situation is not unlike that faced by a couple ordered to divide a house that they own as community property. If one of the spouses chooses to keep the house, he or she is free to use separate property to purchase the other's interest. Here, [husband] must divide his retirement benefits to [wife]. If he does not wish to retire, he must pay her an amount equivalent to her interest." (*Gillmore*, *supra*, 29 Cal.3d at pp. 426-427, fn. omitted.)

Here, the only thing preventing Leslie from receiving her share of the community's interest in Terry's accrued vacation pay is Terry's decision to keep working, yet under *Gillmore*, Terry cannot defeat Leslie's community interest in his accrued vacation pay by invoking a condition wholly within his control. Moreover, as in *Gillmore*, compensation is possible here because the value of Leslie's interest in the accrued vacation pay was established by the evidence: $18,897.60, which equals 480 hours of accrued vacation multiplied by Terry's pay rate at the time of trial ($39.37 per hour), divided in half.

The trial court thus erred in not finding the accrued vacation pay was a community asset and not dividing it based on its cash value at the time of trial. (Fam. Code, § 2552, subd. (a).) Indeed, at oral argument, Terry conceded accrued vacation pay was a community asset that must be divided upon dissolution. We remand the case for the trial

16

court to award Leslie one-half of $18,897.60, or $9,448.80, in the form of a reduction in the amount of her equalization payment.

C.     PERS

The parties stipulated to, and the trial court entered, a qualified domestic relations order (QDRO) that divided the amount of Terry's PERS retirement account, at the time of separation, in half.  The order was entered on May 20, 2010.  Leslie asserts she began receiving her PERS benefits in September 2010.  Leslie complains she was entitled to her share of PERS benefits beginning on March 26, 2009, and she contends the loss of this income was waste.  We disagree.

By statute, Leslie's PERS allowance began to accrue either on the date she designated in her application to PERS as the effective date, or the day after the trial court's order if later, in this case May 21, 2010.  (Gov. Code, § 21296.)  Leslie does not direct us to a copy of her application in the record, so we must assume the court's order established her right to payment.  In addition, the court's order directed PERS to establish Leslie's account "as soon as administratively practicable" after the date of the order.  There is no evidence in the record PERS did anything other than act as quickly as practicable.  She has lost no PERS benefits to which she was entitled.

D.     *Accrued sick leave*

Leslie contends the court erred when it refused to divide and value Terry's accrued sick leave because, upon retirement, Terry can credit his accrued sick leave to PERS for additional service credit.  The community would have an interest in that leave to the extent it affects his retirement, and Leslie fears Terry may take steps that would reduce or eliminate his ability to receive full credit from PERS at the expense of the community.  The trial court reserved jurisdiction to address the accrued sick leave, and we conclude the court did not abuse its discretion in doing so.

17

1. *Additional background information*

Terry accrues sick leave at the rate of eight hours per month without any cap. As of the time of separation, Terry had accrued 1,871.67 hours of sick leave. Under the MOU and upon retirement, Terry's accumulated sick leave is to be credited to Terry's PERS retirement account for additional service credit except to the extent Terry desires to convert any of his sick leave to cash. However, PERS allows Terry to earn no more than 30 years of service credit. Thus, if he works 30 years, his accrued sick leave will not add any value to his PERS retirement. If, on the other hand, he retires after 29 years of employment and applies his accrued sick leave to PERS service credit, he could receive nearly another year in retirement credit; essentially the value of a year of salary for purposes of retirement.

In the event Terry chooses to convert his sick leave to cash, he will not be reimbursed dollar for dollar. Under the MOU, he is limited to converting up to 50 percent of his sick leave for a maximum amount of $3,000. Terry testified $3,000 was the maximum the City would pay for his sick leave. In addition, if Terry becomes seriously ill before retiring, he could theoretically use all of his sick leave, leaving him with no accrued sick leave upon retirement to convert to cash or service credit.

Leslie sought to have Terry's sick leave valued at the disposition as a part of Terry's retirement. She feared if this were not done, Terry would credit his sick leave to PERS, receive another year of service credit and a higher retirement allowance, and she would lose out on that benefit because she started receiving her portion of his PERS benefits before he retires.

The trial court acknowledged that if Terry credited sick leave to PERS upon his retirement, any increase in his retirement would have a community property interest. Terry's counsel agreed, but he asked the court to retain jurisdiction over the issue to make any necessary adjustment to Leslie upon Terry's retirement. In its judgment, the trial

18

court retained jurisdiction over Terry's accrued sick leave, concluding its value could not be determined until Terry retired.

On appeal, Leslie challenges the court's ruling in two respects: its effect on her interest in Terry's sick leave as of the time of separation and her interest as of the time of Terry's future retirement. On the first point, she asserts the trial court did not err in reserving jurisdiction, but she is concerned Terry could transmute any community property interest in the sick leave into his separate property before retiring. On the second point, she claims the court erred by not dividing and valuing the sick leave that could be credited to PERS. She fears that if the community interest is not apportioned now, the community may lose its interest in the leave should Terry work beyond 30 years.

      2.     *Analysis*

Unlike other forms of deferred compensation, such as retirement or vacation pay, sick leave is compensation "in lieu of wages" when an employee absents himself from work due to illness. (*Doyle v. Doyle* (1919) 44 Cal.App. 259, 262 (*Doyle*); see also Lab. Code, § 233, subd. (b)(4).) Sick leave benefits paid while the employee is married are community property. (*Doyle, supra*, 44 Cal.App. at p. 262.) In this regard, accrued sick leave resembles disability insurance benefits. Disability benefits are "to compensate the disabled spouse for lost earnings -- earnings which would normally be separate property after dissolution." (*In re Marriage of Saslow* (1985) 40 Cal.3d 848, 860 (*Saslow*).) Disability benefits are treated as community property when paid during the marriage, but they are treated as separate property when paid after dissolution and before retirement, even though they were earned or paid for during marriage. (See *In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 152 [no community interest in CalSTRS disability allowance paid after dissolution but before disabled spouse's retirement].)

19

However, the community has an interest in any unused disability benefits at the time of retirement. That is because at that point, the payments are no longer in lieu of wages but are paid for purposes of retirement. (*Saslow, supra,* 40 Cal.3d at pp. 858-859.)

Accrued sick leave is to be treated in the same manner. Sick leave is community property when paid during the marriage, but when paid after separation but before retirement, it is separate property paid in lieu of wages. And just as the community has an interest in disability payments at the time of retirement, so too does it have an interest in accrued sick leave at the time of retirement. That is because at that point, the payments are no longer in lieu of wages but are paid for purposes of retirement.

Were disability benefits and, in turn, sick leave benefits, treated as community property when accrued during marriage but paid after separation, the law could inequitably divide the property to the disabled spouse's detriment. "If postdissolution disability benefits are held to be community property, a young ablebodied ex-spouse will be able to work and retain all his or her earnings, and will in addition be entitled to half the disability benefits of the disabled ex-spouse. This might impose a grave hardship on the disabled individual, who not only may not be able to work, but who may also require special equipment or extraordinary care." (*Saslow, supra*, 40 Cal.3d at p. 860.) For the same reasons, we hold that any interest in accrued and unused sick leave at the time of separation and prior to retirement is not community property.

Thus, the trial court's reservation of jurisdiction is to determine any community interest in Terry's accrued sick leave at the time of his retirement. Here, upon retirement, Terry may use his sick leave to purchase service credit with PERS or he may sell it for up to $3,000. In either event, the trial court, by reserving jurisdiction on this issue, will be able to apportion and divide the community interest, whether it is an increase in Leslie's retirement allowance or a share of the cash proceeds.

Leslie contends the trial court should divide the accrued sick leave into his retirement now; otherwise, Terry may work 30 years and not be able to use the sick leave

20

to acquire additional PERS service credit. She claims by not dividing this interest now, we allow Terry to transmute community property into separate property. This is incorrect. As we explained, the community has no interest in accrued sick leave except when benefits are paid during the marriage or upon retirement to the extent earned during the marriage. The court could reasonably conclude there are too many contingencies in play for it to determine now what the community value of Terry's accrued sick leave will be at his retirement. The value could possibly be zero if Terry becomes seriously ill before retiring and is forced to use all of his accrued leave. In that circumstance, the community will bear the loss equally, as the sick leave benefits used would have been Terry's separate property. Given this possibility, the court was well within its discretion when it retained jurisdiction over Terry's accrued sick leave.

E. *Deferred compensation*

Terry had two deferred compensation accounts that, combined, totaled at least $38,000 at the time of separation. The parties could not agree on how to divide them. Terry proposed they be awarded to Leslie if he received the family home. Leslie proposed they be awarded to Terry if she received the family home.

At trial, Terry proposed the accounts be divided equally so that each party would bear his or her own tax consequences. Leslie did not want an in-kind division because she would have to withdraw her portion, bear the tax consequences, and give her portion to Terry as part of an equalization payment. The trial court ordered the accounts to be divided equally, indicating that if an item of property is divided equally, neither party has a basis for objecting to the division. Leslie claims the court abused its discretion because its division resulted in Leslie having to make an equalization payment, thereby losing the value she could have gained from this asset over time had she not been required to cash it out.

The court did not abuse its discretion. When parties are unable to agree on the disposition of community assets, the court must effect an equal division of the net

21

community estate.  (Fam. Code, §§ 2550, 2551.)  The court has great discretion in achieving that result so long as it divides the community estate equally, except as may be otherwise provided by statute.  That the division results in Leslie having to make an equalization payment at the expense of an asset's potential for future gain does not demonstrate the net estate was divided unequally.

## III

### *Other Property Division Issues*

Leslie challenges the manner in which the trial court treated other community and separate properties.  Specifically, she contends the court erred in its treatment of her exclusive use of the family home after separation, her interest in another home that was Terry's separate property before the marriage, animals, a pickup truck that was purchased before separation but sold afterwards, payment of a gym membership, costs of storing and moving Terry's belongings, allegedly undisclosed bank accounts, and loans made to the couple's children.  We conclude the trial court did not abuse its discretion on any of these items.

A.    *Leslie's use of family home*

Leslie had exclusive possession and use of the family home, a community asset, for 25 months from separation until judgment.  The trial court determined the monthly rent would be $1,000.  Terry agreed Leslie had paid taxes and insurance in the amount of $4,277.  This left a total rental value of $20,723, half of which, $10,361, the court found Leslie owed to Terry.

Leslie claims the court made two errors.  First, she asserts she actually paid $7,095 in taxes and insurance while she possessed the property.  Her evidence does not support this claim.  She submitted receipts from paying taxes and insurance while she possessed the property totaling $3,036.  While she submitted copies of additional bills, she does not direct us to evidence showing she paid those bills.  The court did not abuse its discretion

22

in crediting Leslie with $4,277 in paid taxes and insurance. That was more than she proved.

Second, Leslie contends the trial court erred when it did not take into account the community's responsibility for deferred maintenance. Terry had estimated Leslie's possession of the home had created $10,000 in waste. Leslie argues that amount is a reasonable value of the necessary maintenance she deferred on the home because she could not afford it. She argues the trial court on remand should revalue the rental value to account for what should be Terry's contribution to the deferred maintenance. Leslie, however, directs us to no evidence in the record supporting her claim for deferred maintenance. We thus affirm the court's ruling on this issue.

B. *Separate property house*

Two and a half years before marrying Leslie, Terry purchased a home, using his separate property for the down payment. After marrying, the parties lived in the home for seven years and paid the mortgage with community property funds. The parties sold the property. The court determined Terry had a 93 percent separate property interest in the proceeds from the sale of this property, net of the remaining mortgage. The parties used the proceeds from that sale to purchase and improve a parcel of raw land in Durham. Subsequently, the parties sold the land and, with the proceeds, purchased the home in which they lived until separating. The trial court determined Terry was entitled to be reimbursed for his separate property contributions to the marital residence in the amount of $22,500.

Leslie claims she is entitled to be reimbursed for the labor she provided to improving the first home originally purchased by Terry. She contends she provided 1,000 hours of labor to improving that home, and she should be compensated accordingly.

We are not aware of, and the parties have not cited, any published opinion holding a spouse's physical labor on a residence bearing both separate and community property

23

interests is a reimbursable separate property interest. Leslie's labor was an "asset" of the community. Presumably, any improvements she made to the home while the couple lived there that increased the home's value would have been reflected in the home's value, and the community was compensated for that labor in the home's sale. She is not entitled under the community property law to be reimbursed separately for her work.

C.    *Animals*

Leslie asserts that at separation, she and Terry owned two horses, four dogs, and a cat. She contends the trial court erred when it refused to order Terry to pay half of the cost of maintaining the animals after separation and after judgment.

The trial court, however, determined the animals were Leslie's separate property. The court did not expressly award the animals to Leslie, but it awarded all personal property in Leslie's possession to Leslie as her separate property. Animals are considered the personal property of their owners. (Civ. Code, § 655.) Thus, the court awarded the animals to Leslie as her separate property. As a result, Terry is not required to pay any costs toward the upkeep of her separate property.

D.    *Purchase and sale of pickup truck*

Prior to separation, Terry purchased a used pickup truck with community funds. He later sold the truck for a $4,000 cash down payment and deposited the amount in a community bank account. He also received a note from the new buyer in the amount of $13,999. The court characterized the down payment and the note as community property. It divided the down payment as part of dividing the bank account, and it awarded the note to Terry.

Leslie contends the court erred. She asserts $35,594 of community funds was used to purchase the truck. She claims the court valued the old truck at $2,264. She argues the court should have ordered Terry to reimburse her $9,665 based on half of the community property funds he used to purchase the truck. We cannot tell where she derived her amounts of $35,594 to purchase the truck or $9,665 as owed to her.

24

Leslie misunderstands how community property assets are characterized and divided. The court's sole concern is the value of community property. How much that community property cost or how that property was used during the marriage is of no concern. The court characterized the truck as community property, and valued it based on its later sale. The court did not abuse its discretion in doing so.

In addition, the trial court did not err by awarding the note to Terry. The equal division of community property is determined based on the entire community estate, not each individual item. (Fam. Code, § 2550.) As the court explained to Leslie, if the value of community property awarded to Terry exceeded that awarded to Leslie, the court would order Terry to make an equalizing payment. The court did not abuse its discretion in awarding the note to Terry, as Leslie, by receiving the house and other items, still received the greater share of the community estate.

E.    *Gym membership*

A gym membership was paid for on February 19, 2008, 11 days before the parties separated. Leslie contends it was error not to divide the cost between the parties. The cost was never disclosed, but the previous year's cost was $469. She claims Terry owes her $234.

The court did not abuse its discretion in not allocating this expense. It was a community obligation when it was paid, and it was paid with community funds.

F.    *Moving and storage of Terry's belongings*

After Terry left the residence but did not retrieve his belongings, Leslie moved them to the garage. She then paid a mover $812 to move them. She argues Terry owes her the full cost of the moving fees, plus a storage fee of $550 for the time she stored his belongings in the garage.

Leslie, however, incurred these costs on her own initiative. She did not obtain Terry's consent to pay to move his belongings. The court did not abuse its discretion by not charging Terry for these costs.

25

G.      *Allegedly undisclosed bank accounts*

Leslie contends Terry failed to disclose an account at the Butte Community Bank, in which Terry had been depositing disability payments.  At trial, however, Leslie agreed that the Butte Community Bank account was Terry's separate property, as it was opened after the couple separated.  She has no interest in that account.

H.      *Loans to children*

The court awarded loans the couple had made to their adult children to Leslie.  Leslie seems to question this award because she considered the loans to be gifts.  At trial, however, Leslie stipulated to the loans being awarded to her.  She cannot now complain of that award.

## IV

### *Permanent Spousal Support*

The trial court awarded Leslie $900 per month in spousal support.  Leslie contends the court abused its discretion in ordering this amount.  She asserts the court did not consider all of the mandatory support factors Family Code section 4320 required it to consider.  She also claims the court erred by not considering the financial burden she incurred by receiving the house, the disparity of income between she and Terry, years of alleged abuse, and the fact that part of the marital standard of living included savings.  We disagree with her contentions.

The trial court is required to consider the factors contained in Family Code section 4320, " 'but the ultimate decision rests within the court's "broad discretion."  A trial court's exercise of discretion will not be disturbed on appeal unless, *as a matter of law,* an abuse of discretion is shown, i.e., where, considering all the relevant circumstances, the court has "exceeded the bounds of reason" or it can "fairly be said" that no judge would reasonably make the same order under the same circumstances.  [Citations.]' " (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 479-480, quoting Hogoboom & King,

Cal. Practice Guide: Family Law (The Rutter Group 1989) § 6:79, p. 6–96.14, original italics.)

The trial court did not abuse its discretion in its award of spousal support. It considered all of the relevant factors listed in Family Code section 4320. It also considered the parties' financial obligations, their disparity of income, and even the parties' habit of saving. The court wrote: "This is a marriage of long duration and permanent spousal support will be awarded until death or remarriage of the supported party during the life of [Terry]. . . . The parties are in their fifties and in good general physical health. Considering [Leslie's] share of [Terry's] pension, which she can draw, permanent spousal support of $900.00 per month is awarded. This would enable [Leslie] to meet her needs measured by the standard of living established during the marriage. The Court takes the expense of financing the residence into account, along with the amount of other assets and obligations in setting support at this level."

The court found the couple's standard of living during their 27 years of marriage was modest and frugal. They avoided debt. Almost all discretionary funds were used to pay off the home and improve it. Some additional funds were placed in savings and retirement accounts. Because of the marital standard of living, Terry had the ability to pay "modest" support from his salary to maintain Leslie's standard of living, taking into account his earnings and assets. Terry had net monthly disposal income of approximately $5,000, and expenses of $2,530. He was 57 years old and in good health. The tax consequences from the dissolution would impact Terry significantly by having to file separately. Leslie had no earned income. She would qualify to receive social security disability benefits due to a mental disability if not for receiving a monthly payment from Terry's PERS retirement. She does not have marketable skills and does not need retraining to acquire marketable skills. Neither party contributed to the attainment of an education, training, career position, or a license by the supporting party. The parties do not have dependent children. There was no evidence of domestic violence between the

27

parties or any criminal convictions of abuse. This review covered all of the applicable factors Family Code section 4320 required the court to consider.

Leslie claims the court did not consider the couple's pattern of saving money as part of determining her standard of living. The parties' history of saving significant portions of their income may be considered as an element of their marital standard of living. (*In re Marriage of Drapeau* (2001) 93 Cal.App.4th 1086, 1097-1098.) The court did consider the couple's history of savings, but it found most of the couple's disposable income went into the house, not into savings. It stated it considered all of the parties' financial obligations, and it awarded support based on Leslie's need and Terry's ability to pay. The court did not abuse its discretion in doing so.

V

*Attorney Fees and Costs*

Leslie contends the trial court abused its discretion when it denied her requests for attorney fees, both pendente lite and at judgment. We conclude she waived her claim to pendente lite fees, and the trial court did not abuse its discretion in ordering both parties to bear their own fees and costs.

A.    *Additional background information*

After she began representing herself, Leslie made many complaints regarding her inability to pay for attorneys and expert witnesses. The court acknowledged Leslie was in a disadvantaged position, but it stated it could not remedy that other than by ordering she be paid fees for hiring an attorney. However, Leslie had already used at least three attorneys, "[a]nd that," the court stated, "hasn't helped either; so I don't know where we can go at this time."

Later during trial, after Leslie complained about not being provided costs to hire expert witnesses, the court responded, "That's not something the Court is obligated to compensate for. If you're at a disadvantage, that's a fact of life for you, it is not something that the Court can compensate for."

28

Leslie again complained about not being able to afford an expert witness. The court stated, "If you tell me you can't afford to bring that evidence before the Court, I can feel sorry for you but I can't disregard the rules of law and evidence." When Leslie asked if one of the rules of law was that she should have enough money to proceed with trial, the court responded, "No. Definitely not. It's not the rule of court."

In a written declaration, Leslie stated she had incurred some $27,000 in attorney fees and another nearly $6,700 in costs, including her expenses from representing herself. Terry testified he had incurred $10,000 in attorney fees. He offered to pay $5,000 towards Leslie's attorney fees. The court stated that was a possible scenario; another was both parties bearing their own attorney fees and costs based upon the resources available to them. The court noted there was evidence the value of some of the financial accounts stipulated to be awarded to either of the parties had already diminished, leaving the court to "assume that some of those funds were used for living expense[s] and attorney fees." Hearing this, counsel for Terry revoked his offer and argued the parties should bear their own fees and costs.

In its statement of decision, the trial court ordered both parties to bear their own fees and costs. The court wrote: "Taking into account the resources of the parties and their needs and ability to pay, the court will order that each side will bear their own costs and attorney fees. An argument could be made that actions of either party complicated and delayed the action, increasing the costs of litigation, but these increased costs are likewise being borne equally."

B.      *Analysis*

Family Code section 2030 requires a family court to ensure that each party in a dissolution proceeding "has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of

29

maintaining or defending the proceeding during the pendency of the proceeding." (Fam. Code, § 2030, subd. (a)(1).)

If the court's assessment of the parties' respective income and needs demonstrates there is a disparity in access to funds to retain counsel, and that one party is able to pay for legal representation for both parties, the court "shall" make an order awarding attorney fees and costs. (Fam. Code, § 2030, subd. (a)(2).) In addition, the making of the award must be "just and reasonable under the relative circumstances of the respective parties." (Fam. Code, § 2032, subd. (a).)

The court may award fees and costs at any time during the proceeding or at judgment for fees and costs incurred before or after the proceeding commenced, or for postjudgment proceedings. (Fam. Code, § 2030, subds. (b), (c).)

A motion for attorney fees and costs in a dissolution proceeding "is left to the sound discretion of the trial court. [Citations.] In the absence of a clear showing of abuse, its determination will not be disturbed on appeal. [Citations.]" (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768-769.)

However, "[w]hile the family court has considerable latitude in fashioning or denying an attorney fees award, its decision must reflect an exercise of discretion and a consideration of the appropriate factors as set forth in [Family Code] sections 2030 and 2032. [Citations.] In assessing one party's relative need and the other party's ability to pay, the family court may consider all evidence concerning the parties' current incomes, assets, and abilities, including investment and income-producing properties. Further, in determining whether to award attorney fees to one party, the family court may consider the other party's trial tactics. [Citation.]" (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1313-1314 (*Tharp*.)

To the extent Leslie seeks to appeal from denials of her requests for pendente lite fees, her claim is forfeited. Temporary attorney fee and cost orders are appealable as a final judgment on a collateral matter. (*Tharp, supra*, 188 Cal.App.4th at p. 1311.) The

failure to file a timely appeal from the denial of attorney fees forfeits the right to challenge the order. (*In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 638.) Leslie did not file an appeal from the trial court's earlier denials of her requests for fees and costs and, as a result, has forfeited her claim to them here.

Leslie's appeal from the trial court's denial of fees at judgment is timely. However, the evidence is insufficient to conclude the trial court abused its discretion in denying her attorney fees and costs. The court had before it the evidence of the parties' needs and their ability to pay, including their access to funds being divided by the judgment. It concluded there was no great disparity of access to attorneys, and that the just and reasonable result in light of the parties' relative circumstances and trial tactics was to make each bear their own fees and costs. We cannot say the court abused its discretion in doing so.

## VI

### *Bias*

Leslie contends the trial court was biased against her. She alleges the court exhibited bias by, among other matters, acknowledging its familiarly with Terry's attorney; refusing to award her pendente lite fees, costs, and sanctions; relying only on Terry's proposal for the division of property; not allowing Leslie to conduct full discovery; reversing the order of proof at trial because Terry had an attorney; disallowing Leslie's testimony because she was not asking herself questions in the correct manner; and cutting short her closing argument. We have reviewed the record and conclude Leslie has not established judicial bias.

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court to hear and rule on Leslie's motion to modify temporary spousal support retroactively, to divide and award to Leslie the community property interest in Terry's accrued vacation, and to hear and rule on Leslie's motion for sanctions for Terry's failure to disclose the medical trust.

31

In all other respects, the judgment is affirmed.  Costs on appeal shall be borne separately by the parties.  (Cal. Rules of Court, rule 8.278(a)(3).)


                                                            NICHOLSON         , Acting P. J.



We concur:



          ROBIE             , J.



          MURRAY           , J.