Filed 4/1/16  Marriage of Soin CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re the Marriage of MARIANNE and PETER SOIN. | C076194 |
| MARIANNE SOIN,<br><br>Respondent,<br><br>v.<br><br>PETER SOIN,<br><br>Appellant. | (Super. Ct. No. 12FL04567) |

Peter Soin (Peter)[1] appeals from a judgment after a court trial, raising multiple issues concerning spousal support, sanctions, and other areas of family law.  Marianne Soin (Marianne) concedes that a postjudgment decision by this court in another case requires a small modification of the judgment, but otherwise defends the judgment,

---

[1]  We refer to the parties by their first names as they share a surname.

1

including the imposition of sanctions against Peter for discovery and other abuses.  We shall modify the judgment in certain respects and remand for reconsideration as to sanctions.

## BACKGROUND

The parties to this long-term marriage had no minor children, and each had high-paying, long-term jobs.  They had positive equity in the marital home and few debts.  We will add additional facts as necessary to address each properly briefed issue.

Marianne petitioned for divorce on July 27, 2012, alleging the parties married on June 3, 1984, separated on July 14, 2012, and had no minor children, facts agreed by Peter.  Each party filed pretrial statements outlining the issues that they had been unable to resolve amicably.

Trial was held on November 14-15, 2013.  The process of preparing a statement of decision was protracted, and the judgment was not entered until March 11, 2014.  Peter timely filed his notice of appeal therefrom.

## DISCUSSION

### I

### *Accrued Vacation Pay*

Peter contends no substantial evidence supports the trial court's division of the value of the accrued vacation pay earned by each party.  We disagree.

On appeal, we must view the evidence in the light most favorable to the lower court's decision; we do not reweigh evidence.  (See *Bancroft-Whitney Co. v. McHugh* (1913) 166 Cal. 140, 142; *Findleton v. Taylor* (1962) 208 Cal.App.2d 651, 652 ["Under the often-enunciated rule, which is so often forgotten in the enthusiasm of advocacy, we look to the evidence accepted by the trial court"].)

Peter has worked for the State of California for 30 years.  Peter testified his hourly wages were "close to about $50," with time-and-a-half for overtime.  Peter had 870 hours of vacation pay at the time of separation (July 14, 2012).  Marianne used those hours and

2

his wages to testify that the value of his vacation pay was $45,240.  She took his monthly pay and divided it "by hours worked per month, kind of an approximation, an hourly rate, and applying it times 870 units."  Based on this testimony, the trial court found Peter's vacation pay was valued at $45,240.

On appeal, Peter faults Marianne's calculations (870 hours times $52 per hour equals $45,240) in part because there was no testimony about the number of hours he worked per month or his hourly pay rate.  We find no error.

Both of Peter's income and expense declarations, filed under penalty of perjury, stated that he worked "about" 40 hours per week.  This undermines his repeated claim there was no evidence about his work hours.  Peter testified his base salary was about $104,000, and that in 2013 he earned "around" $4,000 in overtime.  He made "about" $50 per hour.  He also testified his monthly income was $8,670 after the cessation of state furloughs, which works out to $104,040 per year.  Taking $108,000 (his lower income figure plus most recent overtime figure) and dividing it by 52 weeks and by 40 hours per week results in a figure of just over $51.92 per hour.  Rounding this to $52 seems reasonable, given that Peter's testimony itself was approximated.  (See Civ. Code, § 3533 ["The law disregards trifles"]; *Brown v. Ball* (1932) 123 Cal.App. 758, 767 ["The amount involved is too trifling to take up the time of this court"].)  If Peter thought this amount was materially wrong, he could have presented contrary evidence.  But Peter's own evidence, both documentary and testimonial, supports the trial court's finding.

Peter's attack on Marianne's vacation pay figure fares no better.  Marianne's schedule of assets and debts, filed under penalty of perjury and served on Peter before trial, showed the value of her accrued vacation pay was $35,287.  At trial, she testified that she arrived at this figure by "taking the number of hours I had accrued at the date of separation times my current rate, hourly rate, of pay."  That is a rational method of calculating the value of her accrued vacation pay.  Peter faults this testimony because Marianne did not specify the number of hours or her hourly rate.  But, as the owner of her

3

vacation pay (subject to Peter's interest) Marianne could testify as to its value.  (See *Newhart v. Pierce* (1967) 254 Cal.App.2d 783, 789 ["[t]he owner of real or personal property may competently testify to its value"]; *People v. Haney* (1932) 126 Cal.App. 473, 475.)  Peter could have cross-examined her to try to break down that total value into its component parts, or he could have presented any contrary evidence he had on this point.  Peter cannot now challenge Marianne's testimony of the total value when he did not impeach that value at trial.  Contrary to Peter's view, this is not like cases where an *expert's* opinion can be challenged on appeal based on the expert's use of a flawed methodology, or flawed factual predicates.  (Cf. *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1134-1136.)

II

*Peter's Accrued Sick and Personal Leave Program Hours*

Peter contends the trial court erred in making an award based on his accrued sick and personal leave program (PLP) balances, arguing the court should have reserved jurisdiction on these matters; in the alternative he contends no substantial evidence shows how much leave he had.  Based on a later decision of this court, Marianne concedes the trial court must reserve jurisdiction on these matters.

After the judgment was issued in this matter, we decided *In re Marriage of Moore* (2014) 226 Cal.App.4th 92.  In part we held the trial court properly reserved jurisdiction as to a husband's accrued sick leave, because it *might* be added to his retirement when he chose to retire in the future, but whether that would happen was unknown, because the husband might have to use the sick leave after separation but before retirement.  (*Id*. at pp. 105-107.)  "Sick leave is community property when paid during the marriage, but when paid after separation but before retirement, it is separate property paid in lieu of wages."  (*Id*. at p. 106.)

Here, without the benefit of our *Moore* decision, the trial court divided Peter's accrued sick leave hours and his accrued PLP hours.  Although the parties differ in their

4

approach, they essentially agree this court should modify the judgment to strike references to both kinds of leave, and insert a clause stating that the trial court reserves jurisdiction over these issues. We accept this joint view and shall so modify the judgment. (See Code Civ. Proc., § 906; Fam. Code, § 210.)[2]

### III

*Sanctions*

Peter contends the trial court should not have sanctioned him $7,500, because he was not given proper notice of sanctions, and no substantial evidence shows he engaged in the various particular instances of purported misconduct relied on by the trial court in support of the sanctions award. We need not reach the latter claim because we agree that Peter did not receive timely and specific notice of each of the grounds supporting sanctions that were relied on by the trial court. Thus remand is required.

Family Code section 271, subdivision (a) provides in part: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction." "An award of attorney's fees and costs as a sanction pursuant to this section shall be imposed only after notice to the party against whom the sanction is proposed to be imposed and opportunity for that party to be heard." (*Id.*, subd. (b).)

Marianne did not file a noticed motion for sanctions. In a section captioned Summary of Case Issues, Marianne's pretrial statement mentioned some facts which purportedly unnecessarily increased her attorney fees, including (1) Peter's alleged

---

[2] We need not address Peter's alternate claim that no substantial evidence supports the trial court's figures, as that would be premature. Nor do we express any view about whether Marianne did or did not promptly confess these figures had to be stricken.

5

failure to engage in good faith settlement efforts, (2) Peter's alleged unreasonable delay of Marianne's efforts to withdraw $50,000 to buy a home, (3) Peter's alleged unreasonable delay in signing a quitclaim in connection with Marianne's home purchase, and (4) Peter's alleged unreasonable delay of trial for eight months in order to "pursue unwarranted discovery on theories that simply are weird."

However, in the section of Marianne's pretrial statement that was explicitly captioned Attorney's Fees and Costs/Sanctions, which presumably would be the place to describe what specific grounds for sanctions were alleged, Marianne requested sanctions of $10,000 listing Peter's purported refusal to provide a settlement proposal. That alleged failure by Peter was the only specific ground for sanctions as to which Peter was given notice before the trial began.

When, at the outset of trial, the trial court listed sanctions as one of the issues to be tried, Peter did not object. Later, in her opening statement, Marianne described conduct that allegedly unreasonably increased her attorney fees, including (1) Peter's act of subpoenaing bank records he already had in his possession, (2) frustrating her ability to withdraw money to buy a house, (3) refusing to sign the quitclaim deed, and (4) excessive litigation over Venture Oaks, LLC, of which Marianne was a partner. Peter's responsive opening statement denied that he committed any misconduct and alleged that Marianne was uncooperative. At the beginning of the second day of trial, before he rested, Peter claimed a noticed motion for sanctions was required, and also pointed out--correctly--that Marianne's pretrial statement of issues "wasn't very specific" except as to the amount of sanctions sought. In other words, he raised the point that Marianne did not list all of the grounds of purported misconduct she alleged at trial. Further, if the trial court found Marianne had made a prima facie case for sanctions against Peter, Peter's counsel wanted to testify. She would provide information as to some matters (such as the deed issue) as to which Peter's conduct purportedly was the result of counsel's

6

reasonable tactical advice. She would also testify as to Peter's level of direct knowledge, if any, of related issues.

After the trial court ruled that sanctions were properly before the court, Marianne testified further about some of Peter's conduct. Peter's counsel testified by way of offer of proof and was cross-examined. Counsel then argued that some of her client's actions regarding the new grounds raised by Marianne were reasonable, and some were the product of counsel's litigation strategy.

Ultimately, the trial court awarded Marianne $7,500 in sanctions, listing the following grounds in support: (1) Peter failed to promote settlement by making any settlement counter-offer; (2) Peter and his counsel engaged in excessive discovery regarding Venture Oaks, LLC; (3) Peter asked for bank statements he already possessed; (4) Peter's counsel failed to provide information about Peter's CalPERS benefits; (5) Peter frustrated Marianne's efforts to withdraw money to buy a house; and (6) Peter delayed signing a quitclaim deed for that purpose. The trial court did not apportion the sanction amount among these six issues.

As is evident, of these six grounds for sanctions relied on by the trial court, only the first one was embraced by the part of Marianne's pretrial statement captioned as pertaining to sanctions, namely, the failure to present a settlement counter-offer.

The trial court was correct that a noticed motion for sanctions is not mandatory, so long as adequate notice that sanctions are sought is given. (See *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1495 ["the only procedural requirement in the statute is that an award of attorney fees and costs as a sanction may be imposed 'only after notice to the party against whom the sanction is proposed to be imposed and opportunity for that party to be heard' "]; *In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 178 ["this record clearly demonstrates that Wife had adequate notice that she might be sanctioned under [Fam. Code] section 271"].) But Marianne's pretrial statement of issues encompassed only the generic claim that Peter did not cooperate, and

7

the specific claim that he had not provided a settlement proposal.  Whatever "notice" Peter received of the other grounds would have to be based on interpreting *other* portions of Marianne's pretrial statement which were not captioned as relevant to sanctions, or based on the grounds advanced after trial had already begun.  Although the question may be closer than Peter acknowledges, we conclude that due process requires more notice than he received.

In the analogous situation of sanctions under Code of Civil Procedure section 128.5, a court reversed a sanctions award where the ground *orally* stated was " 'unorthodox and wholly improper conduct by counsel,' " but the grounds relied on by the trial court in imposing sanctions were that the party "had intentionally exceeded the one-hour estimate knowing the expenditure of time was unwarranted and had filed a meritless peremptory challenge."  (*In re Marriage of Quinlan* (1989) 209 Cal.App.3d 1417, 1420, 1421.)  The oral notice "was not specific enough to give counsel a clue as to how to respond" and "[t]he grounds actually recited in the formal order imposing sanctions -- the time delay and the peremptory challenge -- were not asserted as a basis for sanctions . . . at any time before rendition of the sanctions order."  (*Id*. at p. 1421; see Hogoboom & King, Cal. Practice Guide:  Family Law (The Rutter Group 2015) Attorney Fees, Costs and Sanctions, ¶ 14:116 ["the notice must advise of the *specific grounds* and *conduct* for which sanctions are sought"] (Hogoboom & King).)

As Peter contends on appeal, he was entitled to timely notice of *each* ground on which sanctions were sought, so that he could strategize with counsel and marshal the evidence, legal authorities, and argument that would be prudent to oppose each ground. (See *Parker v. Harbert* (2012) 212 Cal.App.4th 1172, 1178 ["the notice provided must specify the authority relied upon and must advise of the specific grounds and conduct on which sanctions are to be based"].)

We agree that once it became clear during trial that Marianne expanded the grounds alleged in support of sanctions beyond the one ground explicitly captioned as a

8

basis for sanctions in her pretrial statement, Peter's counsel tried to make the best of the situation by testifying about purported reasons for some actions. He also filed a request for a statement of decision with proposed findings that inadequate notice had been given for sanctions, and alternatively arguing that insufficient evidence supported sanctions. This ability on the part of Peter and his counsel to be heard partly erodes Peter's claim of a deprivation of due process. But it was not enough.

We agree with Peter that given the haphazard way in which sanctions were awarded--the absence of a formal motion, followed by written notice specifying only one ground, followed by other grounds alleged during trial, ultimately resulting in an unapportioned award based on multiple grounds--the existing award cannot stand. Although sanctions are an important tool to reduce unnecessary litigation in family law cases, it is not sufficient to pile on additional reasons as the trial develops. Instead, a clear and comprehensive statement of the grounds for sanctions--whether by motion or otherwise--should be given before trial, so that the other side knows what grounds are pursued.

Because the trial court relied on several points as to which no adequate notice was given, and the trial court did not apportion the award such that we can discern how much was assessed for each ground, we must remand. (See *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 658-659 [sanctions partly based on mistake of law, remand needed because "it is impossible to determine from the court's sanction award what portion of the award is attributable to this erroneous conclusion"]; *In re Marriage of Abrams* (2003) 105 Cal.App.4th 979, 993, disapproved on another point in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1097 ["[h]aving found merit in only one of the court's three reasons for imposing the attorney fee sanction," a remand was necessary].)

To avoid further uncertainty, the ideal course would be for the trial court to direct Marianne to serve a noticed motion for sanctions, allow Peter the opportunity to respond with a written opposition, and conduct a new hearing at which those issues will be

9

properly joined, giving each party a full and fair opportunity to marshal and present evidence. (See *In re Marriage of Duris & Urbany* (2011) 193 Cal.App.4th 510, 516 ["[t]he matter is remanded to the trial court with instructions to conduct a new hearing with proper notice"].) For convenience, the trial court may choose to allow the parties to rely on the current transcript, supplemented as necessary by additional testimony.

For this reason, it would be premature for us to address Peter's claims of insufficient evidence of each stated ground based on the current record.[3]

IV

*Marital Standard of Living*

Peter contends his spousal support award is too low because the trial court made an erroneous finding about the marital standard of living, specifically, that the trial court underestimated the level of expenses during the marriage. As we shall explain, this contention is forfeited for lack of a timely and explicit prejudice argument, and in any event it fails on the merits.

A. *Standard of Review*

"An award of spousal support is a determination to be made by the trial court in each case before it, based upon the facts and equities of that case, after weighing each of the circumstances and applicable statutory guidelines. [Citation.] In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it. 'The issue of spousal support, including its purpose, is one which is truly personal to the parties.' [Citation.] In awarding spousal support, the court must consider the mandatory guidelines of section

---

[3] We note that parts of Peter's briefing impliedly suggests or assumes the trial court was required to credit Peter's or his counsel's testimony. We note that "[p]rovided the trier of the facts does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted." (*Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660.)

10

4320. Once the court does so, the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion. [Citation.] 'Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders. [Fn. omitted.]' " (*In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 93 (*Kerr*).)

B. *The Law*

In making a spousal support award, a trial court must consider a number of factors, no one of which is dispositive, including but not limited to the "extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage," (Fam. Code, § 4320, subd. (a)) the "needs of each party based on the standard of living established during the marriage," (*id*., subd. (d)) the "duration of the marriage," (*id*., subd. (f)) the "ability of the supported party to engage in gainful employment," (*id*., subd. (g) the "age and health of the parties," (*id*., subd. (h)) and the "balance of the hardships to each party" (*id*., subd. (k)).

Thus, "standard of living" is not controlling in determining spousal support, but "establishes a basis or reference point against which the various statutory guidelines may be weighed. [Citations.] The Legislature intended the marital standard of living to mean 'reasonable needs commensurate with the parties' *general* station in life,' achieved by the date of separation." (*Kerr*, *supra*, 77 Cal.App.4th at p. 94, italics added.) "This standard is best understood in its ordinary sense, that is, upper, middle or lower income, although findings should be specific enough to be helpful in later appellate or modification proceedings." (*Id*. at p. 94, fn. 7.) Thus, mathematical precision is neither practicable nor necessary; the goal is to achieve "substantial justice for the parties." (*Id*. at p. 93.)

The marital standard of living finding is "not intended to specifically spell out or narrowly define a mathematical standard. If the Legislature had intended something more specific, it could have prescribed a more specific measurement, such as the marital standard of living as measured by the gross annual family income. The Legislature has

11

wisely chosen not to do so." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 491 (*Smith*); see *In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 207 (*Ackerman*); *In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1560 [it is "a general description of the station in life that the parties had achieved by the date of separation"] (*Nelson*).)

A court may rely on average income, although that is not the only way to ascertain the standard of living. (*Ackerman*, *supra*, 146 Cal.App.4th at p. 208.) A trial court may also consider--but contrary to Peter's view is not bound by--the amount the couple has spent during the marriage, or any portion thereof. (See *In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 565-566.) Expenditures are relevant only "to the extent marital expenses reflect marital lifestyle." (Hogoboom & King, *supra*, ¶ 6:960.) Raw expenditures cannot restrict a trial court's ability to achieve substantial justice.

C. *The Trial Court's Findings*

The trial court listed several of the factors set forth in Family Code section 4320 and described how they did or did not apply in this case, as follows.

The marriage lasted just over 28 years, the parties had no minor children, and one adult child lived in the marital home with Peter. Peter had a master's degree, had been a CalTrans engineer for 30 years and appeared likely to retain that employment. The evidence showed Peter earned a base salary of about $104,000 per year, and in 2013 earned approximately $4,000 in overtime. His overtime was variable in amount, but paid time-and-a-half on his hourly wage, which he testified was about $50. Marianne, a CPA, made about $17,666 per month and testified the parties had a very comfortable lifestyle. Her bonuses further elevated the standard of living. The couple had significant equity in the marital home, which upon sale should net each party about $200,000.

Marianne had not shown a spousal support award to Peter would compromise her lifestyle, but Peter "hovers in [a] place of financial uncertainty" because he "is the financially unsophisticated partner having delegated the financial management of the community resources" to Marianne during the marriage.

12

In ascertaining the needs of each party based on the marital standard of living, the trial court first reviewed the applicable legal standards, citing and describing various appellate decisions on the subject, some of which we have discussed, *ante*. The trial court then addressed the subject of the couple's expenses.

The trial court found Peter's evidence about expenses "was convoluted and at times in clear mathematical error. . . . He was at a loss as to how to summarize in a meaningful manner his expenses and his need[s]. He relied on his attorney for direction and some of the finer details were clearly lost on him. Questioning him for further clarity was not helpful and he became demonstratively defensive and frustrated."

The trial court explicitly stated that a document heavily relied on by Peter in the trial court and on appeal, Exhibit D, beginning with a two-page summary entitled "Soin Spending," was "received purely for illustrative purposes of the outflows of the party's income from their Bank of America bank account." Exhibit D purported to summarize other accounts and expenditures, and was accompanied by voluminous attachments-- about 275 pages--but because of the limited use for which it was admitted, we confine ourselves to describing the Bank of America column. Peter conceded his counsel prepared Exhibit D, a fact the trial court indicated went to the document's evidentiary weight.[4] Exhibit D shows the gross spending from the Bank of America account averaged over $17,000 per month from January 2009 to date of separation. However, the trial court credited testimony that some of the expenditures were atypical, such as "amounts being applied to the back end of the [marital home] mortgage, the acquisition of a $30,000 car, tax payments, pay down on a credit card that had an accumulated

---

[4] Peter does not head and argue a claim on appeal that the trial court erred in limiting usage of Exhibit D to the Bank of America account information. The expenditures reflected from that account are as follows: For 2009, $193,534.62; for 2010, $206,986.90; for 2011, $251,717.84; and for January-July 2012, $88,583.52. Taking the total ($740,822.88) and dividing it by the number of months (43) yields an average of $17,228.44 per month, as Peter essentially acknowledges on appeal.

13

balance . . . of about $16,000. The spending summary . . . was largely placed in context by the rebuttal testimony of wife."

The trial court then found: "The tax returns were the most probative of the parties' income during the five years preceding separation. [¶] With some of the clarifications provided by [Marianne] it did appear that the parties were actually spending in the range of $11,000 to $14,000 per month. Looking at both parties['] income and expense declarations filed at or around that date of separation that would be somewhat consistent.[5] [¶] It is in the face of this that [Peter's] proposed needs of $10,000 per month seem to reflect the expenses of the combined household of three [i.e., Peter, Marianne, and one adult child] rather than the proposed needs of one person." "The [marital] standard of living was very comfortable as affirmed by [Marianne] and as illustrated by the cash outflows from the parties' bank accounts. They lived within their means, had no consumer debt and drove nice newer cars." Although Peter sought a spousal support award of $4,800 to $5,100, the court found that would put him at a higher standard of living than Marianne, and the court emphasized that the "[m]arital standard of living is [but] one consideration as is a determination of need measured by estimated [expenses]." (Italics omitted.)

The trial court rejected Marianne's request, based on Peter's income and career, that no spousal support should be awarded, but noted that "it is impossible to maintain the marital standard of living in two households." The trial court instead made the following finding: "Assuming [Marianne's] stated expenses of $7,350 and [Peter's] of $8,413 that is combined expenses of $15,763. That amount is not out of line with what was testified about by both parties albeit from different standpoints. With a presumed expense of

---

5 Marianne claimed expenses of $11,487 in her August 2012 declaration, and $7,350 in her October 2013 declaration. Peter claimed expenses of $14,941 in his September 2012 declaration and $11,612 in his October 2013 declaration. The trial court adjusted Peter's last figure, as explained *post*.

14

$7,881, one half of the total, [Peter] experiences a shortfall of $2,005 . . . . [¶] Under *all* of the above circumstances and weighing *all* of the factors an initial spousal support order consistent with maintaining the marital standard of living is awarded payable by wife to husband in the sum of $2,500 per month effective 9-1-2013." (Fn. omitted, italics added.)[6]

D. *Peter's Claims on Appeal*

In his attack on the $2,500 per month spousal support award, Peter leads with the claim that the trial court's finding that the couple had been spending "in the range of $11,000 to $14,000 per month" is not supported by the evidence.

He emphasizes his own Exhibit D. As he interprets it--ignoring the seven months in 2012 before separation--it shows a raw outflow from the couple's Bank of America account of about $18,000 per month. Peter reasons that this evidence is irrefutable, and

---

[6] We emphasize the word "all" because the trial court, as the law requires, came up with a figure that would do "substantial justice" (*Kerr, supra,* 77 Cal.App.4th at p. 93) and did not purport to derive an exact figure, such that if one component changed, that would necessarily have a concomitant impact on the ultimate award, as we explain, *post.* The combined marital expense figure of $15,763, was derived as follows. Marianne's expense figure of $7,350 was taken from her most recently filed declaration. Peter's claimed monthly expenses of $11,612, but the trial court disallowed $2,335 from debit and credit card expenses not otherwise explained--figures Marianne had not included in her declaration--leaving $9,277. From this, the trial court cited Peter's calculations of how he could refinance his mortgage, and found "[w]ith both adjustments [Peter's] expenses are approximately projected to be $8,413." Peter does not make any reference to the facts or reasoning underlying this finding, instead, he argues the raw expenses should control. Accordingly, for lack of a headed and developed argument attacking the trial court's expense figure for Peter, we accept that figure as accurate. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Further, the trial court also looked to Peter's own 2012 combined income and expense declaration, which showed "expenses of $14,941 per month, representing the household expenses shortly before the parties separated into two households and these included [an adult child's] expenses. Of these claimed expenses [Peter] included $2,500 in savings and investments. The testimony from both showed this was not a regular occurrence. The parties were not savers. . . . Making that adjustment alone reduces the claimed [combined] expenses to $12,441 per month."

15

because the trial court's understanding of the couple's marital spending was off by several thousand dollars, the spousal support award is necessarily incorrect.

First, even if we agreed with Peter, we would not reverse the award because he fails to timely argue prejudice. Second, Peter does not show error.

### 1. *Failure to Argue Prejudice*

A trial court's exercise of discretion must be based on the application of correct legal principles and accurate information. (See *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298.) "In this connection we employ the equivalent of the substantial evidence test by accepting the trial court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences." (*In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 358.)

But this does not mean that a party demonstrates an abuse of discretion simply by showing that one of many factors leading to a conclusion may have been based on a partially mistaken fact. No judgment may be set aside absent a miscarriage of justice. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *People v. Watson* (1956) 46 Cal.2d 818, 836.) "To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice." (*Brown v. Newby* (1940) 39 Cal.App.2d 615, 618; see *People v. Jordan* (1986) 42 Cal.3d 308, 316.)

Thus Peter, as the appellant, has the burden to demonstrate prejudice from any error. But because he has not articulated how the trial court's alleged error regarding the subsidiary fact of marital expenditures caused prejudice in the ultimate award of spousal support--an award based on a number of other factors Peter does not challenge--he has forfeited his claim of error. (See *Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105-106 (*Paterno*).) As we have explained *ante*, the marital standard of living is not mathematically precise. It was enough for the trial court to find that the parties were comfortably well off, and had stable, well-paying,

16

and secure jobs. (See *Kerr*, *supra*, 77 Cal.App.4th at pp. 93-94.) The goal of a spousal support order is to achieve "substantial justice for the parties," (*id*. at p. 93) not derive a rigid or rote number. (See *Ackerman*, *supra*, 146 Cal.App.4th at p. 207; *Smith*, *supra*, 225 Cal.App.3d at p. 491; *Kerr*, *supra*, 77 Cal.App.4th at p. 94, fn. 7.)

In *some* cases an error of the magnitude alleged by Peter might be critical. However, in this case, given the high incomes of the parties, their substantial equity position in the family home (about $200,000 each), and other factors, it was incumbent upon Peter to explain why any claimed error as to expenses would have changed the spousal support award. The trial court knew the couple's joint and individual financial situation, that is, a "general description of the station in life that the parties had achieved by the date of separation." (*Nelson*, *supra*, 139 Cal.App.4th at p. 1560.) That provided a "general reference point" (*ibid*.) for the trial court's ultimate support finding. In such circumstances, Peter had a duty to explain why the claimed error of a few thousand dollars in the expense column would have changed the *ultimate* spousal support award to the extent that the award failed to do substantial justice to him.

Peter's opening brief simply assumes any error regarding expenses during the marriage compels reversal of the spousal support order. This is "simply a conclusion, unsupported by any explanation." (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 410.) After his failure to address prejudice was pointed out by Marianne's brief, Peter asserts in his reply brief that it would be reasonably probable that a different result would have been obtained had the trial court found $18,000 a month in spending instead of $11,000-14,000 per month. He argues simply that the spousal support award would have been increased by the percentage of the increase in the spending finding.

We reject this contention of prejudice. First, Peter improperly withheld his purported claim of prejudice until his reply brief. (See *Kahn v. Wilson* (1898) 120 Cal. 643, 644; *Utz v. Aureguy* (1952) 109 Cal.App.2d 803, 808.) Second, his mode of argument is speculative, and ignores the central point that the marital standard of living--

17

which is not necessarily dictated by expenditures--is but one of many factors used to achieve substantial justice between the parties. (See Fam. Code, § 4320; *Nelson*, *supra*, 139 Cal.App.4th at p. 1560; *Kerr*, *supra*, 77 Cal.App.4th at pp. 93-94 & fn. 7; *Smith*, s*upra*, 225 Cal.App.3d at p. 491.) Changing one subsidiary figure by a particular percentage would not inevitably change the award in the slightest, much less necessarily change it by that same percentage. Peter has forfeited his claim of error regarding marital expenditures because he has not properly demonstrated prejudice.

2. *Substantial Evidence of the Couple's Spending Pattern*

Even if we reached the factual dispute Peter raises, viewing the evidence in the light most favorable to the judgment, he has not shown error.

Marianne testified the couple's monthly household spending, as shown by her 2012 Income and Expense Declaration, was $11,847.

Peter filed an Income and Expense Declaration in September 2012, not long after separation, showing total expenses of $14,941. At trial, he testified that was his then-accurate opinion of total household expenses including both parties' expenses. Although Peter testified that he used figures Marianne gave him in preparing the document, he did not testify they were wrong. The trial court reduced Peter's figure by the $2,500 claimed as savings and investments, leaving Peter's own declaration showing marital expenses of $12,441.

Thus, the testimony and documentary evidence of both parties supports the trial court's finding that the couple spent around $11,000-14,000 per month.

On appeal, Peter repeats insistently that his Exhibit D, which shows the outflow from the couple's Bank of America account, and which reflects a higher monthly average of spending (closer to $18,000 for 2009-2012, and just above $17,200 if averaged through July 2013) must control on the question of expenses. But the trial court was not required to find that the raw outflow from the couple's Bank of America account compelled it to find a higher standard of living.

18

The trial court found the parties spent "in the range of $11,000 to $14,000 per month" during the marriage. In so finding, the trial court explicitly explained that it did not fully accept Peter's interpretation of Exhibit D. Peter had largely relied on his counsel to prepare the exhibit, and Marianne was able to identify specific atypical "outflows," such as extra payments towards the mortgage and credit card debt, and purchase of a $30,000 car. The trial court found "With some of the clarifications provided by [Marianne] it did appear that the parties were actually spending in the range of $11,000 to $14,000 per month. . . . [¶] It is in the face of this that [Peter's] proposed needs of $10,000 per month seem to reflect the expenses of the combined household of three [i.e., including one adult child] rather than the proposed needs of one person." We observe that some months on the chart reflect extraordinarily high outflows, like September and October 2011, with figures of $32,742.19 and $53,546.28, respectively, and April 2009, with an outflow of $27,501.16. On the other hand, outflows for 13 of the 36 months in question ranged between $11,042.28 (June 2011) to $14,840.13 (May 2011), showing that *often* the raw outflow was approximately in the range found by the trial court to reflect the marital expenses, that is, $11-14,000. The outflow for the seven months in 2012 before separation averaged only $12,655.22. Although Peter claims this period--closest to separation--is lower because Marianne received her 2012 bonus after the date of separation, the trial court was not required to accept that this fact materially skewed the most recent data before separation, nor are we. Further, the trial court was only required to find the general standard of living and not some exact figure. The amount of the expenses was only one way of measuring standard of living, which itself was but one of several statutory factors to consider.

Peter's contention regarding the tax returns, which generally showed the parties spent about what they earned, is similarly unconvincing. The trial court found the tax returns were the most reliable indication of income, but did not find they precisely

established the marital standard of living.  Nor did it have to.  Accordingly, if we reached Peter's claim, we would reject it.  No abuse of discretion appears on this record.

V

*Spousal Support: Overtime Pay*

Peter objects to the portion of the judgment he interprets as ordering him, in effect, to pay Marianne a percentage of any overtime pay he receives.

The trial court did not order Peter to pay Marianne anything.  The trial court ordered that overtime earned by Peter would reduce Marianne's payments to him, pursuant to schedules discussed more fully in Part VI, *post*.  This is not the same as ordering him to pay spousal support to Marianne.  It is merely recognition that to the extent he earns more money by working overtime, he needs less support from her to maintain himself appropriately, in accordance with the marital standard of living.

The only authority Peter cites is Family Code section 4330, subdivision (a), which merely states that a court "may order a party to pay for the support of the other party" an amount the court determines is just and reasonable, considering the marital standard of living and other circumstances.  This statute does not preclude a court from ordering a *variable* amount to be paid by the payer to the payee, that is, the statute does not preclude periodic reductions in support payments where appropriate.  In effect, this mechanism is akin to a "step-down" order, of the kind routinely used in appropriate cases, where the supported spouse may have a future increase in income.  (See, e.g., *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 309.)  In any event, because Peter will not under the current judgment pay Marianne any support in this case, we reject his claim of error.

VI

*Use of Bonus and Overtime Schedules*

Peter separately challenges the trial court's use of schedules (or tables) showing percentages of his overtime pay, and percentages of Marianne's bonus pay, for the purpose of adjusting the amount of support he is due from month to month.

20

We first place Peter's contention in its proper legal context.

In *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33 (*Ostler & Smith*), as relevant to this appeal, the wife was awarded spousal support, but the husband's income included variable bonuses. The trial court in part reasoned: " 'No future bonus is guaranteed. It would therefore not be appropriate to base a support order on Husband's bonus income and then require him to file motions to modify at such times as the bonus is reduced. It would be more fair to all parties to base the support order on Husband's income from salary and dividends, and to allocate a portion of the future bonus income to the children and to Wife by way of a percentage interest so that future litigation will not be necessary as the bonus income changes.' " (*Id.* at pp. 41-42.) Accordingly, the spousal support order in part ordered the husband to pay the wife 15 percent of any annual bonus as an addition to or as an escalator of the base spousal support amount. (*Id.* at p. 42.) The *Ostler & Smith* court then made this pertinent observation:

> "Although patterns in marital breakups emerge, each couple has such a diverse mix of circumstances that trial courts must have broad discretion in weighing and balancing the various factors in each particular marriage before making a suitable support award. A trial court will not be reversed absent an abuse of that discretion. An abuse 'occurs when, after calm and careful reflection upon the entire matter, it can be fairly said that no judge would reasonably make the same order under the same circumstances.' [Citations.] Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders. [Citation.] Here, the record reflects that the court weighed and considered each circumstance required under [the then-applicable statutes], and the record supports the trial court's exercise of discretion." (*Ostler & Smith*, *supra*, 223 Cal.App.3d at p. 50.)

In this case, the trial court attached percentage schedules to the spousal support award to adjust the gross figure up or down, depending on whether Marianne received a bonus or Peter worked overtime. These schedules were made using the "Xspouse" computer program. The judgment recites in part:

> "A Smith-Ostler [*sic*] bonus schedule shall issue as to both parties, as to [Marianne] and her bonus income and as to [Peter] and his overtime income. The

21

parties will each notify the other within 3 days of receipt of any bonus income providing documentary evidence of the bonus and or overtime received and remit payment pursuant to the attached bonus schedules.

"The attached bonus schedules are provided for the sole purpose of indicating the percentage of the net due as support based on the gross amount received. The temporary guideline formula is not relied upon by the court in determining what the appropriate level of support is under Family Code Section 4320. Pursuant to page 2 line 24-26 of [Peter's] pre-trial statement, counsel for [Peter] invited the court to utilize the bonus schedule in place under the temporary order in determining a Smith-Ostler [*sic*] amount for this initial spousal support order.

"As to overtime income earned by [Peter]: to the extent that [Peter] earns overtime income that is income available to defray his expense and reduce his need for support. That income should be taken into consideration in reducing the support obligation that [Marianne] has to [Peter]. To the extent that [Peter] receives overtime income; [Marianne]'s support obligation is reduced pursuant to the bonus schedule, entitled 'additional cost to [Peter]' for that given month. Because his overtime income is [unpredictable] and variant depending on his job assignment the court does not annualize his overtime earnings. [Peter] has the obligation to provide [Marianne] within 3 days of receipt of overtime earnings, proof of the same and spousal support due for that month shall be adjusted accordingly. To the extent he has already received spousal support due for that given month; he will owe the overpayment as a refund of spousal support within 3 days." (Italics omitted.)

Thus, the trial court followed the general model approved in *Ostler & Smith*, taking into account the particular circumstances of the parties' possible variable and unknowable salary bumps. (See also *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375, 1387, approving *Ostler & Smith* method.) The trial court also disavowed a point alleged in Peter's objection to a proposed statement of decision, wherein Peter asserted the use of bonus schedules based on a temporary guideline formula derived from the Xspouse program was inappropriate in making a permanent support award.

On appeal Peter asserts the trial court improperly used the temporary guideline amounts derived from the computer program in determining a permanent spousal support award. But the record does not support Peter's repeated claim that the trial court in fact

22

"abdicate[d] responsibility by turning to the [computer-generated] *temporary* support guideline, even if used only as a reference point." (*In re Marriage of Zywiciel* (2000) 83 Cal.App.4th 1078, 1081-1082; see *In re Marriage of Schulz* (1997) 60 Cal.App.4th 519, 526-527 [Family Code "Section 4320 requires an independent evaluation of *all* of a variety of specifically enumerated factors. If the trial judge *begins* with the proposed temporary figure and then makes adjustments (or merely uses some of the section 4320 factors to *justify* a figure based on the temporary order), the ultimate order is not *really* the product of a truly independent exercise of judicial discretion"].)

The portion of the judgment quoted above clearly and carefully explains what the trial court was doing and why it was appropriate on the particular facts of this case for the trial court to do it. The trial court explained that the bonus and overtime schedules were "provided for the sole purpose of indicating the percentage of the net due as support based on the gross amount received. *The temporary guideline formula is not relied upon by the court in determining what the appropriate level of support is under Family Code Section 4320.*" (Italics added.) Thus, read in context, the judgment shows that the trial court found an appropriate spousal support amount independently, and then exercised its discretion to adopt figures derived with the assistance of a computer program to make its bonus and overtime schedules.

"The general rule is that a trial court is presumed to have been aware of and followed the applicable law." (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) Here, the trial court explicitly stated it was following the law. We must presume on appeal that official duties have been regularly performed (Evid. Code, § 664), and this presumption extends to the actions of trial judges. (See *Olivia v. Suglio* (1956) 139 Cal.App.2d 7, 9.)

Moreover as Marianne correctly points out, Peter invited the trial court to use bonus schedules. As the judgment itself references, Peter's pretrial statement of issues asked the trial court to order Marianne to pay him "a percentage of her annual bonus pursuant to the bonus schedule currently in place for temporary spousal support." Thus,

23

he invited the use of such schedules.  (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 389, p. 447 ["Where a party by his or her conduct induces the commission of error, the party is estopped from asserting it as a ground for reversal"] (Witkin).)[7]

To the extent Peter's briefing may be read to mean that he objects to the specifics of the bonus schedules finally adopted, he has failed to articulate this claim with coherent argument or authority.  Accordingly, if he meant to make such an argument, it is forfeited.[8]  (See *In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

VII

*Date of Termination of Marital Status*

Peter contends the trial court erred by selecting a marital termination date of December 31, 2013, a date that preceded the date of the judgment.

At the end of trial, on November 15, 2013, when Marianne reminded the court that she had asked that the status change be done before the end of that year, and the trial court said it would be done nunc pro tunc if necessary to accommodate preparation of the judgment, Peter's counsel did not interpose any objection.  Marianne's objective was to avoid adverse tax consequences from a later status change.

---

[7] As Peter points out, the trial court ultimately adopted *different* bonus schedules in the judgment than those attached to the temporary spousal support award.  (See fn. 5, *post*.) But this does not change the fact that he invited the trial court to use bonus schedules in the final award.  Nor does it matter that he did not invite the trial court to use both a bonus schedule as for Marianne and an overtime schedule as for him.  The point is that he approved the use of the schedules.

[8] In his reply brief, Peter acknowledges the differences in the bonus schedules (or tables) arise from the fact that the temporary ones were based on the temporary spousal support order and the court generated the second set of tables by using the increased spousal support ordered in the judgment.  There is no bar to using such schedules where appropriate, and it was necessary for the trial court to adjust the figures to take into account its permanent spousal support award.

On appeal, Peter now challenges the date of termination, arguing it was beyond the court's powers to backdate it, despite the fact that preparation of the formal judgment was delayed because of other issues in dispute. However, he knew the proposed date of termination and voiced no objection to it. In such circumstances he cannot raise any alleged procedural irregularity about the date of the termination for the first time on appeal. (See 9 Witkin, *supra*, § 396, pp. 453-454, § 400.)

Further, Peter fails to argue how he has been prejudiced. As we have explained, we may not reverse a ruling absent prejudice. Even Peter's reply brief does not explain how he was prejudiced. For lack of any claim of prejudice, too, his contention of error is forfeited. (See *Paterno*, *supra*, 74 Cal.App.4th at pp. 105-106.)

## DISPOSITION

The judgment is modified by striking references to Peter's sick leave and PLP hours and inserting in lieu thereof a clause stating: "The trial court reserves jurisdiction over the division of Peter's sick leave and PLP hours." The sanctions award is reversed and the cause is remanded for the trial court to reconsider that issue, consistent with this opinion. The parties shall bear their own costs. (Cal. Rules of Court, rule 8.278 (a)(3).)

/s/
Duarte, J.

We concur:

/s/
Hull, Acting P. J.

/s/
Hoch, J.

25